119 Cal.Rptr.2d 557 (2002)
97 Cal.App.4th 1315
The PEOPLE, Plaintiff and Respondent,
v.
Tommy Lee FRYMAN, Defendant and Appellant.
No. H020743.
Court of Appeal, Sixth District.
April 30, 2002.
Review Granted July 31, 2002.
*561 Marylou Hillberg, Santa Rosa under appointment by the Court of Appeal, for Defendant and Appellant.
Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant, Ronald A. Bass, Senior Assistant Attorney General, Laurence K. Sullivan, Supervising Deputy Attorney General, Morris Lenk, Deputy Attorney General, Attorneys for Plaintiff and Respondent.
WUNDERLICH, J.
I. Introduction
At the General Election on November 7, 2000, the electorate passed Proposition 36, an initiative entitled the "Substance Abuse and Crime Prevention Act of 2000" (the Act). The Act dramatically changed the penal consequences for those convicted of nonviolent drug possession offenses. In particular, such offenders are placed on probation for mandatory drug treatment instead of "being sent to prison. An uncodified provision of the Act delayed its effective date until July 1, 2001. This provision also made the Act prospective only.
In this case, defendant Tommy Lee Fryman was convicted of a nonviolent drug possession offense before July 1, 2001. Because he had prior serious felony convictions, he was sentenced under the "Three Strikes" law to life in prison. However, had he been convicted after that date, he would have been released on probation for drug treatment.
We conclude that the distinction drawn by the Act's prospective-only provision between those convicted before July 1, 2001, whose judgments are not yet final, and those convicted after that date affected defendant's fundamental interest in liberty. We further conclude that the distinction is not necessary to further a compelling state interest. Therefore, we hold that the drastic difference in treatment of the two groups of defendantsโhere the difference between incarceration for life and release on probationโviolates the constitutional guarantee of equal protection under the law.

II. Statement of the Case

A jury convicted defendant Tommy Lee Fryman of being under the influence of cocaine. He then pleaded guilty to possession of cocaine base and admitted nine prior felony convictions alleged as strikes *562 under the Three Strikes law. (Health & Saf.Code, ง 11350; Pen.Code, งง 667, subds. (b)-(i); 1170.12.)[1] The court sentenced him to a term of 25 years to life, and defendant appealed from the judgment.
On appeal, he claims the court abused its discretion in declining to dismiss his strikes in furtherance of justice. He also claims his sentence violates the constitutional proscriptions against cruel and/or unusual punishment. In a supplemental brief, defendant further claims that he is entitled to a remand for resentencing under the Act.
We agree with defendant's supplemental claim, reverse the judgment, and remand the matter for resentencing.
Defendant also filed a petition for writ of habeas corpus, which this court ordered considered with the appeal. In it he claims he was denied effective assistance of counsel because his attorney failed (1) to investigate the legality of his prior strike convictions for false imprisonment and (2) to file, or join his codefendant's, motion to suppress evidence.
We dispose of the habeas petition by separate order filed this day. (See Cal. Rules of Court, rule 24(a).)

III. Facts

On October 31, 1998, Officer Eve Woloszcuk of the San Jose Police Department was assisting another officer, who passed on information that two black people would be involved in a drug transaction in the area of Hopkins and Alfred Streets in San Jose. Woloszcuk proceeded to that location and observed defendant and female codefendant Long. When Woloszcuk shined a light on them, Long ran up to the door of a house and started knocking. Defendant did not move. Woloszcuk ordered her to return to the street, and she complied. Woloszcuk requested identification (I.D.) and asked whether they lived in the area. Defendant said he had no I.D. and did not live there. While talking to them, Woloszcuk observed symptoms that led her to suspect both of being under the influence of a drug. She also observed two baggies fall from Long's pocket and land between Long and defendant. Woloszcuk retrieved them and saw what she thought was drug residue inside. She also found crack cocaine on the ground between Long and defendant. At that point, Woloszcuk arrested both of them. Later, during a strip search of defendant, police found 1.2 grams of crack cocaine hidden between his buttocks.

IV. Remand for Resentencing

Defendant contends that he is entitled to benefit from the Act and therefore the matter must be remanded for resentencing. He argues that under the common law rule of mitigation, the Act applies retrospectively to him because his judgment is not yet final. Alternatively, he argues that if the Act is inapplicable under the rule of mitigation, then the Act denies him equal protection under the law.
We find that the rule of mitigation is inapplicable. We further find that under its own terms, the Act does not apply to defendant. However, we agree with his equal protection claim that the Act must be applicable to those who would otherwise be eligible under the Act but who were convicted of a nonviolent drug possession offense before July 1, 2001, and whose judgments are not yet final.

A. An Overview of the Act

We summarize the main provisions of the Act and those specific sections pertinent in this case.
*563 Section 2 of the Act states the reasons for the initiative measure. "The People of the State of California hereby find and declare all of the following: [ถ] (a) Substance abuse treatment is a proven public safety and health measure. Nonviolent, drug-dependent criminal offenders who receive drug treatment are much less likely to abuse drugs and commit future crimes, and are likelier to live healthier, more stable and more productive lives. [ถ] (b) Community safety and health are promoted, and taxpayer dollars are saved, when nonviolent persons convicted of drug possession or drug use are provided appropriate community-based treatment instead of incarceration. [ถ] (c) In 1996, Arizona voters by a 2-1 margin passed the Drug Medicalization, Prevention, and Control Act, which diverted nonviolent drug offenders into drug treatment and education services rather than incarceration. According to a Report Card prepared by the Arizona Supreme Court, the Arizona law: is `resulting in safer communities and more substance abusing probationers in recovery,' has already saved state taxpayers millions of dollars, and is helping more than 75 percent of program participants to remain drug free." (Ballot Pamp., Gen. Elec. (Nov. 7, 2000) text of Prop. 36, ง 2, p. 66.)
Section 3 of the Act declares its purpose and intent: "(a) To divert from incarceration into community-based substance abuse treatment programs nonviolent defendants, probationers and parolees charged with simple drug possession or drug use offenses; [ถ] (b) To halt the wasteful expenditure of hundreds of millions of dollars each year on the incarcerationโand reincarcerationโof nonviolent drug users who would be better served by community-based treatment; and [ถ] (c) To enhance public safety by reducing drug-related crime and preserving jails and prison cells for serious and violent offenders, and to improve public health by reducing drug abuse and drug dependence through proven and effective drug treatment strategies." (Ballot Pamp., Gen. Elec., supra, text of Prop. 36, ง 3, p. 66.)
To achieve its purposes, the Act added various sections to the Penal Code and the Health and Safety Code.[2]
Section 1210, subdivisions (a) to (d) define the terms used in the Act, including "nonviolent drug possession offense," "drug treatment program" and "drug treatment," "successful completion of treatment," and "misdemeanor not related to the use of drugs." Sections 1210.1 and 3063.1, however, are the main vehicles of change.
Section 1210.1, subdivision (a) provides, in relevant part, "Notwithstanding any other provision of law, and except as provided in subdivision (b), any person convicted of a nonviolent drug possession offense shall receive probation. As a condition of probation the court shall require participation in and completion of an appropriate drug treatment program .... A court may not impose incarceration as an additional condition of probation. Aside from the limitations imposed in this subdivision, the trial *564 court is not otherwise limited in the type of probation conditions it may impose. Probation shall be imposed by suspending the imposition of sentence." (Italics added.)
Section 1210.1, subdivision (b) specifies exceptions to the general requirement of probation. Relevant here is section 1210.1, subdivision (b)(1), which excludes defendants previously convicted of serious or violent offenses, "unless the nonviolent drug possession offense occurred after a period of five years in which the defendant remained free of both prison custody and the commission of an offense that results in (A) a felony conviction other than a nonviolent drug possession offense, or (B) a misdemeanor conviction involving physical injury or the threat of physical injury to another person."[3]
Section 1210.1, subdivision (c) limits the length of treatment and establishes the procedures to be followed by the probation department and drug treatment providers, including the preparation of ongoing progress reports and notification concerning a probationer's nonamenability to drug treatment.
Section 1210.1, subdivision (d) authorizes the court to dismiss the underlying drug possession charge after the "successful completion of drug treatment" and specifies the effect of such a dismissal on one's right to possess a concealable firearm and on the subsequent use and disclosure of records concerning the arrest. (ง 1210.1, subd. (d).)
Section 1210.1, subdivision (e) sets forth procedures for revoking probation, regardless of when it was imposed, due to drug and non-drug related crimes or the violation of drug and non-drug-related conditions of probation.
Section 3063.1 parallels the provisions of section 1210.1 but concerns the treatment of parolees who commit nonviolent drug possession offenses or violate the conditions of parole.
Finally, uncodified section 8 of the Act (Section 8) states, "Except as otherwise provided, the provisions of this act shall become effective July 1, 2001, and its provisions shall be applied prospectively."[4] (Ballot Pamp, Gen. Elec. supra, text of Prop. 36, ง 8, p. 69.)
Defendant's claim raises issues concerning the meaning and scope of Section 8. However, we need not address these issues if defendant is otherwise ineligible under the Act.

B. Defendant's Eligibility under the Act

Defendant pleaded guilty to possession of cocaine base, and our summary of the facts reveals that the offense was nonviolent. Thus, unless defendant was excluded under section 1210.1, subdivision *565 (b), probation would be mandatory under subdivision (a).
As noted, section 1210.1, subdivision (b)(1) excludes those with a prior conviction for a serious or violent felony unless, for a period of five years, (1) they have remained free of "prison custody" and (2) they did not suffer a felony conviction other than for a nonviolent drug possession offense or a misdemeanor conviction involving physical injury or the threat of physical injury to another person. (ง 1210.1, subd. (b)(1).)[5]
The record reveals that defendant has suffered prior felony convictions, including some for serious and violent offenses. However, defendant's most recent felony conviction occurred in 1991. Moreover, it does not appear that defendant was in prison during this five-year period before his current offenses except in connection with the current charges.[6]
The People argue that defendant's current prison term disqualifies him because he cannot satisfy the requirement that he remain free of prison custody for five years. We disagree. Section 1210.1, subdivision (b)(1) requires only that a defendant remain free of prison custody for the five-year period before committing the current offense. The record contains no evidence that defendant was in prison during this period.
Although defendant suffered no felony convictions during the five-year period except for the current offenses, he did suffer a misdemeanor battery conviction. (งง 242 & 243, subd. (a).) For that offense, he received a 15-day jail term followed by probation, with the condition that he not strike, annoy, or harass the victim.
The People claim that the battery conviction disqualifies defendant because the probation condition indicates that his offense involved injury or the threat of injury. We disagree. The record does not reveal the circumstances surrounding *566 the battery. The conviction itself establishes only an unlawful touching, which does not necessarily involve injury or an express or implied threat of injury. (See People v. Longoria (1995) 34 Cal.App.4th 12,16, 40 Cal.Rptr.2d 213.) Indeed, defendant was sentenced to only 15 days in jail. Moreover, since a probation condition need only reasonably relate to the misdemeanor battery (see People v. Carbajal (1995) 10 Cal.4th 1114, 1120-1121, 43 Cal.Rptr.2d 681, 899 P.2d 67), the probation condition does not necessarily reflect defendant's actual conduct. Under the circumstances, the mere conviction for misdemeanor battery and the probation condition do not constitute substantial evidence that defendant committed a misdemeanor involving injury or the threat of injury.
In sum, we conclude that if defendant were to be sentenced under the Act based on the record before us, section 1210.1, subdivision (a) would mandate probation. Under the circumstances, therefore, we proceed to the merits of defendant's claim.[7]

C. Applicability of the Rule of Mitigation

Citing In re Estrada (1965) 63 Cal.2d 740, 48 Cal.Rptr. 172, 408 P.2d 948 (Estrada) and the common law rule of mitigation, defendant contends that because his judgment is not yet final, the Act applies retrospectively to him. We disagree.
Under the common law rule, a criminal defendant is accorded the benefit of a mitigation of punishment adopted before his criminal conviction becomes final unless the Legislature clearly expresses a contrary intent[8] (People v. Rossi (1976) 18 Cal.3d 295, 299, 134 Cal.Rptr. 64, 555 P.2d 1313.) Thus, in Estrada, supra, 63 Cal.2d at p. 748, 48 Cal.Rptr. 172, 408 P.2d 948, the California Supreme Court held that "where the amendatory statute mitigates punishment and there is no saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed." (Italics added.) Estrada explained the rationale for the rule: "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply." (Estrada, supra, 63 Cal.2d at p. 745, 48 Cal.Rptr. 172, 408 P.2d 948.)
Recently, in In re DeLong (2001) 93 Cal.App.4th 562, 113 Cal.Rptr.2d 385 (DeLong), Division Three of the Second Appellate District found the rule of mitigation inapplicable because Section 8 expressly makes the Act prospective. (Id. at p. 567, 113 Cal.Rptr.2d 385; accord, People v. Floyd (2002) 95 Cal.App.4th 1092, 1100, 116 Cal.Rptr.2d 256; People v. Legault (2002) 95 Cal.App.4th 178, 181, 115 Cal. Rptr.2d 352.) We agree. Section 8 clearly and unambiguously manifests an intent that the Act not apply retrospectively.
*567 However, this conclusion does not completely resolve defendant's claim. The question remains: What does prospective application of the Act mean? Does the Act now applyโi.e., prospectivelyโto defendant?

D. The Prospective Only Provision in Section 8

Section 8 does not itself specify the event or occurrence that serves as the point of reference for distinguishing prospective from retrospective application.[9] To determine that point, we consider other provisions of the Act. (See Lakin v. Watkins Associated Industries (1993) 6 Cal.4th 644, 659, 25 Cal.Rptr.2d 109, 863 P.2d 179 [meaning of provision determined with reference to context and other provisions of statute].) In particular, we focus on section 1210.1, subdivision (a), which mandates probation for "any person convicted of a nonviolent drug possession offense." (ง 1210.1, subd. (a), italics added.) The plain meaning of this provision is that unless and until one has been convicted, the Act does not apply. From this provision, we infer an intent to make the date of conviction the reference point for the prospectivity clause. (See DeLong, supra, 93 Cal.App.4th at p. 568, 113 Cal.Rptr.2d 385 [reaching the same conclusion].)[10]
We find support for this view in the ballot pamphlet for the General Election of November 7, 2000.[11] A summary of Proposition 36 states, "A YES vote on this measure means: Adult offenders convicted of being under the influence of illegal drugs or using, transporting, or possessing illegal drugs for personal use would generally be sentenced to probation and drug treatment." (Ballot Pamp. Gen. Elec., supra, Quick Reference Pullout Guide, p. 3, italics added.) The Analysis by the Legislative Analyst similarly states, "Under this proposition, effective July 1, 2001, an offender convicted of a `nonviolent drug possession offense' would generally be sentenced to probation, instead of state prison, county jail, or probation without drug treatment." (Ballot Pamp., Gen. Elec., supra, Ballot Measures Defined, p. 23, italics added.) The Analysis continues, "Offenders convicted of nonviolent drug possession offenses would be sentenced by the court for up to one year of drug treatment in the community and up to six additional months of follow-up care." (Ibid., italics added.) The strongest support, however, is in the argument favoring the initiative, which states, "If Proposition 36 passes, nonviolent drug offenders convicted for the first or second time after 7/1/2001, will get mandatory, court-supervised, *568 treatment instead of jail." (Ballot Pamp, Gen. Elec., supra, argument in favor of Prop. 36, p. 26, italics added.)
Reading the pertinent provisions of the Act together in light of the evidence of legislative history, we conclude that the Act was intended to apply prospectively to those convicted on or after July 1, 2001.
We next determine whether defendant was convicted on or after July 1, 2001. Although the answer may seem obvious, its nevertheless requires some understanding of what convicted means under the Act. Moreover, such an understanding is essential in resolving defendant's equal protection claim.

E. The Meaning of Convicted

Courts have long found that the term conviction lacks a fixed definition. (Belong, supra, 93 Cal.App.4th at p. 568, 113 Cal.Rptr.2d 385; People v. Rhoads (1990) 221 Cal.App.3d 56, 60, 270 Cal.Rptr. 266; Helena Rubenstein Internal v. Younger (1977) 71 Cal.App.3d 406, 418, 139 Cal.Rptr. 473.) Consequently, courts derive its meaning from the surrounding context.
For example, where the existence of a prior conviction has triggered the imposition of an enhancement or one of the more severe punishments reserved for repeat offenders, courts have understood conviction to mean only the factual ascertainment of guilt by verdict or plea. (See, e.g., People v. Milosavljevic (1997) 56 Cal. App.4th 811, 816, 65 Cal.Rptr.2d 562; People v. Williams (1996) 49 Cal.App.4th 1632, 1637, 57 Cal.Rptr.2d 448; People v. Shirley (1993) 18 Cal.App.4th 40, 46, 22 Cal. Rptr.2d 340; People v. Rhoads, supra, 221 Cal.App.3d at p. 60, 270 Cal.Rptr. 266; People v. Johnson (1989) 210 Cal.App.3d 316, 324, 258 Cal.Rptr. 347.) According to the courts, this view promoted the statutes' goal of deterring criminal recidivism.
In rejecting the view that conviction included the sentence and judgment, the court in Rhoads explained, "[A] person could commit and plead guilty to any number of violations within the purview of the statute, but so long as sentencing did not occur, the mandatory three-year enhancement would be avoided. The Legislature certainly did not intend to benefit a repeat offender such as defendant based solely on the fortuity of the timing of sentencing." (People v. Rhoads, supra, 221 Cal.App.3d at p. 59, 270 Cal.Rptr. 266; see also People v. Williams, supra, 49 Cal.App.4th at p. 1639, 57 Cal.Rptr.2d 448.)
On the other hand, when a civil disability flows as a consequence of a prior conviction, courts have interpreted conviction to include both the adjudication of guilt and judgment. (See, e.g., Boyll v. State Personnel Board (1983) 146 Cal.App.3d 1070, 1076, 194 Cal.Rptr. 717 [construing statute barring those with convictions from being employed as peace officers]; Helena Rubenstein Internal v. Younger, supra, 71 Cal.App.3d at p. 418, 139 Cal.Rptr. 473 [construing constitutional provision disqualifying those with convictions from holding public office]; Truchon v. Toomey (1953) 116 Cal.App.2d 736, 744-745, 254 P.2d 638 [construing constitutional provision disqualifying those with convictions from voting].) In this context, courts have resolved the ambiguity concerning the meaning of conviction in favor of the person facing the disability and thereby protected and promoted the exercise of fundamental civil liberties.
Here, section 1210.1, subdivision (a) provides, in relevant part, "any person convicted of a nonviolent drug possession offense shall receive probation." This language indicates that first the defendant is convicted and then, if the defendant is otherwise eligible, the court places him or *569 her on probation under the Act. In other words, the conviction precedes the grant of probation, and the Act is applied after the conviction. The excerpts from the Ballot Pamphlet quoted above confirm this understanding. Thus, the plain meaning of section 1210.1, subdivision (a) appears to reflect an intent to make convicted mean the adjudication of guilt.
We note that in DeLong, supra, 93 Cal. App.4th at p. 570, 113 Cal.Rptr.2d 385, the court construed convicted to mean the "adjudication of guilt and judgment." (Original italic; accord, In re Scoggins (2001) 94 Cal.App.4th 650, 657, 114 Cal.Rptr.2d 508; People v. Legault, supra, 95 Cal.App.4th at p. 181, 115 Cal.Rptr.2d 352.)
In DeLong, the defendant was found guilty before July 1, 2001, but sentencing was continued until after that date. At the hearing, the defendant urged the court to apply the Act and grant probation with drug treatment. However, the trial court found the Act to be inapplicable because the defendant was found guiltyโi.e., convicted โbefore the Act became effective. The trial court then suspended imposition of sentence and placed the defendant on probation but not under the provisions of the Act. (DeLong, supra, 93 Cal.App.4th at pp. 564-565, 113 Cal.Rptr.2d 385.)
In a petition for a writ of habeas corpus, the defendant claimed the trial court erred in refusing to apply the Act. (DeLong, supra, 93 Cal.App.4th at pp. 564-565, 113 Cal.Rptr.2d 385.) The appellate court noted that the Act was designed to divert nonviolent drug offenders from incarceration to treatment programs and that it was intended to have "far-ranging application." (Id. at p. 569, 113 Cal.Rptr.2d 385.) Since the Act applied to those who were already on parole or probation when the Act became effective, the court could find "no rationale ... to exclude from its wide reach the limited class of defendants who, as of [July 1, 2001], had been adjudged guilty and were awaiting sentencing." (Id. at p. 569, 113 Cal.Rptr.2d 385.) Rather, to promote the purpose of the Act, the court construed convicted to mean the adjudication of guilt and judgment. The court further explained that for the purposes of the Act, an order suspending imposition of sentence and placing the defendant on probation constitutes a judgment.[12] (Id. at pp. 570-571,113 Cal.Rptr.2d 385.)
Although DeLong's interpretation of convicted promotes the purposes of the Act by extending its benefits to the limited class of defendants found guilty before, but sentenced after, July 1, 2001, that interpretation has a somewhat illogical ramification. According to DeLong, the date of conviction determines a defendant's "eligibility" for probation and drug treatment. (DeLong, supra, 93 Cal.App.4th at p. 567, 113 Cal.Rptr.2d 385.) It follows that eligibility more fundamentally depends on being convicted; or, as noted, being convicted is prerequisite or a condition precedent to eligibility. However, if a defendant is not convicted until he or she has been sentenced or the imposition of sentence has been suspended and the defendant placed on probation, then a defendant becomes eligible under the Act only after he or she has been placed on probation pursuant to the Act. Put more simply, under DeLong, applying the Act makes it applicable.
In any event, whether convicted means the adjudication of guilt and sentence or only the adjudication of guilt, it is clear *570 that under both interpretations, defendant was convicted before July 1, 2001. Thus, under the prospective-only provision, defendant is not eligible for probation and drug treatment. Consequently, we turn to defendant's equal protection claim.

F. Equal Protection Analysis of Section 8

"The right to equal protection of the laws is guaranteed by the Fourteenth Amendment to the federal Constitution and article I, section 7 of the California Constitution. The `first prerequisite' to an equal protection claim is `"a showing that `the state has adopted a classification that affects two or more similarly situated groups in an unequal manner.'"...' [Citations.] [ถ] `Equal protection applies to ensure that persons similarly situated with respect to the legitimate purpose of the law receive like treatment; equal protection does not require identical treatment. [Citation.]' [Citation.]" (People v. Hubbart (2001) 88 Cal.App.4th 1202, 1216-1217, 106 Cal.Rptr.2d 490, italics added.)
In People v. Nguyen (1997) 54 Cal. App.4th 705, 63 Cal.Rptr.2d 173 (Nguyen), this court discussed the meaning of "similarly situated." "There is always some difference between the two groups which a law treats in an unequal manner since an equal protection claim necessarily asserts that the law in some way distinguishes between the two groups. Thus, an equal protection claim cannot be resolved by simply observing that the members of group A have distinguishing characteristic X while the members of group B lack this characteristic. The `similarly situated' prerequisite simply means that an equal protection claim cannot succeed, and does not require further analysis, unless there is some showing that the two groups are sufficiently similar with respect to the purpose of the law in question that some level of scrutiny is required in order to determine whether the distinction is justified." (Id. at p. 714, 63 Cal.Rptr.2d 173.)
In this case, Section 8 creates two classes of nonviolent drug offenders: those convicted before July 1, 2001, whose judgments are not yet final; and those convicted after July 1, 2001. As noted, the purpose of the Act is to save money by ending wasteful spending on incarcerating nonviolent drug offenders and to enhance public safety and health by diverting these offenders to drug treatment. Moreover, as DeLong correctly observed, the Act was designed to have a "wide reach" and "far-ranging application." (DeLong, supra, 93 Cal.App.4th at p. 569, 113 Cal.Rptr.2d 385.) When we view the two classes of offenders in light of the purpose and scope of the Act, we find them sufficiently similar to warrant judicial scrutiny of the distinction drawn by Section 8. Specifically, the members of both classes committed the same type of offense. Moreover, diverting to drug treatment a nonviolent offender found guilty before July 1, 2001, and whose judgment is not final, would save as much money and enhance public safety and health just as much as diverting an offender convicted after that date. Indeed, if an offender in the former group has his or her judgment reversed on appeal, he or she, upon being convicted again, would be eligible for probation under the Act. What makes the two classes dissimilar is merely the date of conviction. However, it is this classification by date that defendant claims is legally unjustified and constitutionally impermissible.[13]
*571 The People suggest that there is no equal protection issue because defendant "is not similarly situated to offenders who have committed their crimes after the Proposition 36's effective date.... Appellant is in no different situation than persons convicted of criminal offenses after the passage of the Determinate Sentencing Law, which became effective July 1977, versus those convicted under the old Indeterminate Sentence [sic] Law that it replaced; or, one who misses a statute of limitations, or who files a notice of appeal too late. Equal protection of the law does not require that these persons who are different in fact be treated as equals." We are not persuaded.
Except for those on probation or parole, the date one commits a nonviolent drug possession offense does not determine whether the Act applies. Thus, the distinction between defendant and one who commits a crime after July 1, 2001, is a straw man. As discussed above, the trigger for the Act is the date of conviction. We also reject the People's broad analogy to the different treatment accorded those who committed their offenses before and after the effective date of the determinate sentencing law, a statute of limitations, or a filing deadline. The analogy fails to explain why those sentenced before and after July 1, 2001, are not similarly situated with respect to the purpose of the Act; nor does the analogy tend to rebut our finding that they are. (Cf. with People v. Gilchrist (1982) 133 Cal.App.3d 38, 183 Cal.Rptr. 709, discussed post, pp. 578-579.)
Having found that the two classes of nonviolent drug offenders created by Section 8 are sufficiently similar to warrant further scrutiny, we must determine the standard that guides us.
"A legislature may distinguish between persons or groups in passing legislation. In ordinary equal protection cases not involving suspect classifications (such as race) or the alleged infringement of a fundamental interest (such as the right to vote or to pursue a lawful occupation), these legislative distinctions are upheld if they have a rational relationship to a legitimate state purpose. [Citation.] If the distinction, however, involves a suspect classification or infringes on a fundamental interest, it is strictly scrutinized and is upheld only if it is necessary to further a compelling state interest. [Citation.]" (People v. Buffington (1999) 74 Cal. App.4th 1149, 1155-1156, 88 Cal.Rptr.2d 696; Bowens v. Superior Court (1991) 1 Cal.4th 36, 42, 2 Cal.Rptr.2d 376, 820 P.2d 600.)
As noted, defendant was sentenced to prison for 25 years to life, but, under the Act, would have remained free on probation for drug treatment. Indeed, the Act would have forbidden the imposition of incarceration as an additional condition of probation. (ง 1210.1, subd. (a).) Defendant claims that the disparity in treatment infringes on his fundamental interest in liberty and triggers review under the strict scrutiny standard. The California Supreme Court's decision in People v. Olivas (1976) 17 Cal.3d 236, 131 Cal.Rptr. 55, 551 P.2d 375 (Olivas) and this court's decision in People v. Nguyen, supra, 54 Cal.App.4th 705, 63 Cal.Rptr.2d 173 convince us that defendant is correct.
In Olivas, the court addressed an equal protection challenge to statutes that divided *572 misdemeanor offenders into two groups based on their ages. The statutes established a sentencing scheme that singled out offenders between the ages of 16 and 21 years for substantially longer periods of incarceration than all other offenders. (Olivas, supra, 17 Cal.3d at pp. 239-242, 131 Cal.Rptr. 55, 551 P.2d 375.) The defendant faced a commitment to the California Youth Authority for three years, whereas an adult would have faced only a six-month term in jail. The court reasoned that because incarceration was a deprivation of liberty, the classification-by-age scheme affected the defendant's "`personal liberty interest.'" (Id. at p. 245, 131 Cal.Rptr. 55, 551 P.2d 375.) The court further concluded that liberty was a "fundamental" interest. (Id. at pp. 246-251, 131 Cal.Rptr. 55, 551 P.2d 375.) Among other things, the court explained that our system of justice exhibits great concern for procedures that may result in restricting liberty and that many of the specific guarantees of due process are, in essence, manifestations of our fundamental respect for personal liberty. (Id. at p. 249, 131 Cal. Rptr. 55, 551 P.2d 375.) The court found that the California Constitution "manifests an even stronger concern for unwarranted deprivations of personal liberty by the state than can be found in the due process clause of the Fourteenth Amendment, itself a strong protection against unwarranted deprivations of liberty." (Id. at p. 250, 131 Cal.Rptr. 55, 551 P.2d 375.) In all, the court stated, "No reason has been suggested, nor can we conceive of any, why the concern for personal liberty implicit in both the California and federal Constitutions is any less compelling in [the] defendant's case. We believe that those charters are no less vigilant in protecting against continuing deprivations of liberty than are their due process clauses in protecting against the initial deprivation of that liberty. We conclude that personal liberty is a fundamental interest, second only to life itself, as an interest protected under both the California and United States Constitutions." (Id. at pp. 250-251, 131 Cal.Rptr. 55, 551 P.2d 375.) Thus, since the defendant challenged a statutory distinction that affected a fundamental interest, the court reviewed it under the strict scrutiny standard.
In Nguyen, supra, 54 Cal.App.4th 705, 63 Cal.Rptr.2d 173 (rev. denied Aug. 20, 1997), this court followed Olivas in addressing a challenge to the Three Strikes law, which divides the class of recidivist offenders currently convicted of petty theft into two groups and treats them differently. Those with prior theft-related convictions are subject to significant prison terms, in some cases 25 years to life, because the prior conviction elevates the current petty theft offense from a misdemeanor to a felony and triggers sentencing under the Three Strikes law. Those without prior theft-related offense are subject to a jail term of six months because the current petty theft conviction remains a misdemeanor and does not trigger the Three Strikes law. (Id. at pp. 713-714, 63 Cal.Rptr.2d 173.) In light of Olivas, this court concluded that the classification scheme affected the defendant's fundamental interest in liberty. "The challenged distinction subjects some petty thieves to life sentences and others to no more than six months in jail. Like the two groups of offenders in Olivas, these two groups of offenders have committed the same offense. While it may be tempting to try to distinguish Olivas on the ground that it involved an age-based classification, the California Supreme Court explicitly stated that its decision that strict scrutiny applied was not based on the classification itself being suspect but solely on the fact that the classification affected a fundamental interest. That same interest *573 is affected by the classification in question here. One group of offenders faces a significantly extended period of incarceration, a life sentence, while the other group faces no more than six months in jail. As in Olivas, the personal liberty interest of the individual offender facing an extended period of incarceration is significantly affected by this classification. We can find no substantial basis for distinguishing the interest at issue in Olivas from the interest at issue here." (Id. at p. 717, 63 Cal. Rptr.2d 173, original italics, fn. omitted.) Consequently, we reviewed the challenged classification scheme under the strict scrutiny standard. (But see id. at p. 720, 63 Cal.Rptr.2d 173 [cone. opn. of Bamattre Manoukian, J, questioning application of strict scrutiny standard of review].)
Like the schemes in Olivas and Nguyen, the classification-by-date-of-conviction scheme here affects defendants' fundamental interest in liberty. Indeed, the impact is greater here than in Olivas and Nguyen. In those cases, both groups suffered at least some period of incarceration, but the classification scheme singled out one group for substantially longer periods. Here, both groups do not face incarceration. Rather, the scheme singles out one group for incarceration, and the other group is free on probation. Moreover, in this case, the impact of the scheme is dramatic: Defendant faces incarceration for 25 years to life, whereas under the Act he would be free on probation for drug treatment. Under the circumstances, therefore, we conclude that the distinction drawn by Section 8 is subject to strict scrutiny.
We acknowledge that some courts have expressed uncertainty concerning when the strict scrutiny test must be applied. (People v. Gonzales (2001) 87 Cal.App.4th 1, 13, 104 Cal.Rptr.2d 247; People v. Goslar (1999) 70 Cal.App.4th 270, 276-277, 82 Cal.Rptr.2d 558; People v. Applin (1995) 40 Cal.App.4th 404, 409, 46 Cal.Rptr.2d 862.) Moreover, as the dissent points out, some courts question whether the court in Olivas intended to subject every Penal Code classification to strict scrutiny. (Dis. opn. of Bamattre-Manoukian, J, post at pp. 583-584; see People v. Nguyen, supra, 54 Cal.App.4th at p. 720, 63 Cal.Rptr.2d 173 [cone. opn. Bamattre-Manoukian, J.]; e.g., People v. Bell (1996) 45 Cal.App.4th 1030, 1047, 53 Cal.Rptr.2d 156; People v. Silva (1994) 27 Cal.App.4th 1160, 1167, 33 Cal.Rptr.2d 181; People v. Davis (1979) 92 Cal.App.3d 250, 258, 154 Cal.Rptr. 817.) Indeed, some courts have applied the rational relationship standard to resolve equal protection challenges to penal statutes that have some effect on a defendant's punishment. (See People v. Alvarez (2001) 88 Cal.App.4th 1110, 1115-1116, 106 Cal. Rptr.2d 447, and cases cited there; In re Bender (1983) 149 Cal.App.3d 380, 196 Cal. Rptr. 801 [distinguishing between statutes that involve an initial deprivation of liberty and statutes that reduce the length of incarceration].)
However, these cases do not cast doubt on the continuing validity and binding precedence of Olivas. Nor do they involve classification schemes that treat the members of two groups so differently with respect to their fundamental interest in liberty. Thus, although application of strict scrutiny may be a matter of dispute in some cases, we consider ourselves bound by Olivas to apply it. (See Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937; People v. Nguyen, supra, 54 Cal. App.4th at p. 717, fn. 6, 63 Cal.Rptr.2d 173.)[14]
*574 The People argue that the rational-basis test applies "because the statute does not involve a suspect classification and appellant does not have a fundamental constitutional right to drug treatment." This argument is meritless. Simply put, it overlooks the obvious and substantial effect that the classification by date of conviction has on defendant's fundamental interest in liberty.
It is settled that when a distinction drawn by a statute is subject to strict scrutiny, the state bears the burden of establishing that the distinction serves a compelling interest and that the distinction is necessary to further that interest. (Kasler v. Lockyer (2000) 23 Cal.4th 472, 480, 97 Cal.Rptr.2d 334, 2 P.3d 581; Olivas, supra, 17 Cal.3d at p. 251, 131 Cal. Rptr. 55, 551 P.2d 375; D'Amico v. Board of Medical Examiners (1974) 11 Cal.3d 1, 17, 112 Cal.Rptr. 786, 520 P.2d 10.)
In reviewing the scheme here, we find guidance in In re Kapperman (1974) 11 Cal.3d 542, 114 Cal.Rptr. 97, 522 P.2d 657 (Kapperman), which also involved a distinction based on the date a statute became effective. There, a new law gave defendants convicted after its effective date presentence custody credit against their prison terms but denied such credit to those, like the defendant, who were already in prison on that date. The defendant claimed that prospective application denied him equal protection. (Kapperman, supra, 11 Cal.3d at pp. 544-545, 114 Cal.Rptr. 97, 522 P.2d 657.) The California Supreme Court agreed.
In opposing this claim, the People noted that the purpose of the Indeterminate Sentencing Law (ISL), under which the defendant was sentenced, was to allow the Adult Authority to mitigate punishment and provide rehabilitation services based on individualized observation and evaluation of each inmate. They argued that since the Adult Authority cannot observe a prisoner in jail before sentencing, credit for such custody would undermine the Adult Authority's ability to make reasoned judgments and thereby interfere with the purpose of the ISL. In rejecting this argument, the court noted, among other things, that "[although the state may have a legitimate interest in preserving the discretionary functions of the Adult Authority by differentiating between [presentence] detention and imprisonment, the state has *575 waived that interest with respect to inmates received into state prison after March 4, 1972. Accordingly, the People must point to some legitimate public purpose served by excluding from the benefits of [the new law] all prisoners received before that time." (Kapperman, supra, 11 Cal.3d at pp. 546-547, 114 Cal.Rptr. 97, 522 P.2d 657, fn. omitted.)
The People argued that differences in the rehabilitative facilities in jails and prisons justified the distinction-by-date provision. (Kapperman, supra, 11 Cal.3d at pp. 547-548, 114 Cal.Rptr. 97, 522 P.2d 657.) In rejecting this argument, the court explained that the new law "does not purport to award credit on the basis of whether a prisoner was incarcerated in a county jail as distinguished from a state prison; rather, credit is granted or withheld solely on the basis of the date on which a person was delivered into ... custody.... Thus, possible differences between county and state rehabilitation programs are in no way related to the classification made by the Legislature and cannot serve to justify that classification." (Id. at p. 548, 114 Cal.Rptr. 97, 522 P.2d 657.)
The People also argued that prospective application was necessary to avoid a burden on the administration of justice, in particular, the difficulty in applying credit to all inmates regardless of the date they were formally committed. However, the court found any alleged difficulty or burden to be illusory. (Kapperman, supra, 11 Cal.3d at p. 549, 114 Cal.Rptr. 97, 522 P.2d 657.) The court also rejected an argument that prospective application would preserve the integrity of previously negotiated plea bargains that had already taken into account the period of presentence incarceration.
In all, the court held that the classification-by-date scheme was not even rationally related to a legitimate state interest, and invalidated the new law insofar as it excluded inmates committed to prison before the law became effective.
Here, the People argue that classification by date of conviction is justified by practical considerations. "... [Cheating a whole new treatment program made it necessary to implement the law in the future. Obviously, time was needed because defendants could not be sentenced to treatment programs that did not yet exist.... [Citation.] The reason for the law being prospective was to allow implementation of the new treatment regime in `an orderly fashion.' ..."
The People's position finds support in People v. Floyd, supra, 95 Cal.App.4th 1092, 116 Cal.Rptr.2d 256.[15] There, the court found a rational basis for distinguishing between those convicted before and after July 1, 2000. "The initiative's effective date was delayed until July 1, 2001, to allow the state time to establish a sufficient number of drug treatment programs available to receive eligible defendants. [Citation.] Prospective application of the initiative helps ensure that the transition will be orderly and effective and reduces the risk that existing drug treatment programs will be overloaded. This is quite reasonable and rational." (Id. at p. 1102, 116 Cal.Rptr.2d 256.)
The Act is now in effect and has been for some months. Presumably, therefore, treatment programs are funded and operational. Moreover, in the absence of any evidence concerning the size of the programs or any statistical information *576 concerning the size of the limited class of nonviolent drug offenders whose judgments are not yet final, it is pure speculation to assert that new treatment programs would be overloaded if this group of otherwise similarly-situated offenders were placed on probation. Thus, we reject the notion that preventing the programs from being overloaded represents a compelling state interest or that keeping this class of offenders incarcerated is necessary to serve that interest. Indeed, given the stated purposes of the Act, we question whether speculation that programs could be overloaded provides a rational basis for keeping defendant incarcerated for 25 years to life.
The People's reliance on Johnson v. Municipal Court (1977) 70 Cal.App.3d 761, 139 Cal.Rptr. 152 is misplaced. There the county established an alcohol detoxification facility under an experimental program designed to provide civil custody as an alternative to criminal prosecution for persons arrested for public intoxication. The defendant was arrested, but there was no more space at the facility, so he was put in jail and later prosecuted. The defendant claimed he was denied equal protection, but the court disagreed. The court explained that the statute authorizing counties to establish detoxification facilities, if they chose to do so, represented "an experiment in an effort to devise a method of dealing with the problem of alcoholism. Jailing of inebriates has been recognized as a futile sort of `revolving door' solution. Doubts as to efficacy of the experimental alternative can be resolved only by trying it. We find no denial of equal protection in such an experiment. The state is not required `to strike at all evils at the same time' [citation]. A legislature may `take reform "one step at a time"' [Citation.] The equal protection guaranty is not violated `whenever officials "prosecute one and not [another] for the same act" [citations] ...' but `simply prohibits prosecuting officials from purposefully and intentionally singling out individuals for disparate treatment on an invidiously discriminatory basis.' [Citation.]" (Id. at pp. 764-765, 139 Cal.Rptr. 152.)
We consider Johnson inapposite. It did not involve a prospectivity clause that distinguishes between similar groups by date of conviction. Moreover, it does not suggest that allowing time to fund and establish drug treatment programs represents a compelling and necessary justification for the prospective scheme.
The People alternatively argue that the electorate made the Act prospective in order to "treat[ ] individuals who have already been sentenced to imprisonment more harshly than individuals who have yet to commit those crimes. [Citation.]" Citing Kapperman, supra, 11 Cal.3d 542, 114 Cal.Rptr. 97, 522 P.2d 657 and People v. Gilchrist, supra, 133 Cal. App.3d 38, 183 Cal.Rptr. 709, the People suggest that carrying out the originally imposed sentence will ensure that the proscriptions against nonviolent drug possession maintain their deterrent effect. We are not persuaded.
As noted above, except for probationers and parolees, the date an offense was committed does not trigger the applicability of the Act. Thus, we do not infer from Section 8 an intent to reserve the benefits of the Act for those "who have yet to commit" their nonviolent drug offenses. Indeed, in DeLong, the court found the Act applicable to a defendant who committed her offense before July 1, 2001.
Next, we note that in DeLong, the court rejected the notion that the effective date of the Act was delayed to preserve stricter sentencing for a few more months. (DeLong, *577 supra, 93 Cal.App.4th at p. 570, 113 Cal.Rptr.2d 385.)
We also reject the People's reliance on Kapperman, but this requires some discussion. In Kapperman, the court opined that the issueโwhether inmates already in prison before the challenged statute became effective were nevertheless entitled to presentence creditโwas not governed by the rule of mitigation articulated in Estrada, supra, 63 Cal.2d at p. 748, 48 Cal.Rptr. 172, 408 P.2d 948. The court noted that Estrada involved a statute that lessened the statutorily prescribed punishment for an offense, whereas the custody-credit statute did not. The court then stated, without further analysis, "The Legislature properly may specify that [statutes lessening the prescribed punishment] are prospective only, to assure that penal laws will maintain their desired deterrent effect by carrying out the original prescribed punishment as written. (Cf. People v. Harmon [1960] 54 Cal.2d 9, 26, 4 Cal.Rptr. 161, 351 P.2d 329 [(Harmon)']....)" (Kapperman, supra, 11 Cal.3d at p. 546, 114 Cal.Rptr. 97, 522 P.2d 657.)
The People suggest that this statement establishes deterrence as a compelling interest and makes prospective application necessary to further that interest. We disagree. First, the statement in Kapperman is dictum and, therefore, not binding. (See 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, งง 945 & 947, pp. 986-988, 989-991.) Indeed, the statement is not part of a comprehensive discussion of the issue. Moreover, the only authority cited for it is Harmon, supra, 54 Cal.2d 9, 4 Cal.Rptr. 161, 351 P.2d 329. However, Harmon does not convince us that the deterrent effect to be gained by carrying out defendant's life sentence represents a compelling and necessary justification for the distinction drawn by Section 8.
In Harmon the defendant, a prisoner, was convicted of assaulting a guard and sentenced under a statute that mandated the death penalty. After pronouncement of judgment but before it became final, the statute was amended in a way that made the death penalty discretionary. The issue before the California Supreme Court was whether the defendant was entitled to the benefit of the amendment. (Harmon, supra, 54 Cal.2d. at pp. 20-21, 4 Cal.Rptr. 161, 351 P.2d 329.) The court acknowledged the common law rule of mitigation but considered it inapplicable. Reading the amendment together with the general statutory savings clause (see Gov.Code, ง 9608), the court found an intent to make the amendment prospective.[16] The court cited numerous cases for the proposition that under the general savings clause, "where a penal statute is repealed, or amended to reduce the legislatively prescribed punishment, after a defendant has violated the statute and before judgment of conviction thereof has become final, the defendant is punishable under the law as it read when his offense was committed." (Harmon, supra, 54 Cal.2d at p. 21, 4 Cal.Rptr. 161, 351 P.2d 329.) The Harmon court explained that if the severe penalty under the former statute "is to have its intended deterrent effect, then it is important (where, as here, the Legislature is silent on the question) that the section should be applied with certainty as it read on the date of the offense. The law as to this defendant has not accomplished *578 all of its intended function; he did not reflect and refrain from stabbing his fellow prisoner. But certainty of application, particularly in the present situation, can still have a deterrent effect on other prisonersโand thereby save the lives of still other prisoners and guards." (Id. at pp. 26-27, 4 Cal.Rptr. 161, 351 P.2d 329, italics added.)[17]
Harmon's deterrent analysis must be viewed in context. The statute at issue dealt with assaultive conduct by prisoners, and the amendment to it did not change the available penalty but simply made it discretionary. Under these circumstances, it does not seem unreasonable for the court to believe that carrying out the harsh penalty might have some tendency to deter future assaultive conduct by prisoners because they could still receive the same punishment, albeit after a discretionary determination.
However, we question the soundness of Harmon's deterrent rationale here. The Act does not make probation for nonviolent drug offenders discretionary; it mandates probation and thus dramatically alters the penal consequences of a conviction for a nonviolent drug possession. Moreover, the Act does not create an experimental program for certain types of offenders of limited duration that may or not be renewed or expanded. In that situation, maintaining the punishment imposed on a person before the program was initiated could reasonably serve a deterrent effect. Here, however, we fail to see how, for example, incarcerating defendant for life might reasonably deter other nonviolent drug offenders because the law now mandates that they receive probation. Moreover, in the absence of any real deterrent effect, imprisoning defendant for life would tend to reflect a "desire for vengeance," which is "not permitted in view of modern theories of penology." (Estrada, supra, 63 Cal.2d at p. 745, 48 Cal.Rptr. 172, 408 P.2d 948.)
The People's reliance on People v. Gilchrist, supra, 133 Cal.App.3d 38, 183 Cal. Rptr. 709 is also misplaced. There, the issue was whether disparate treatment of those who committed their offenses before and after the effective date of the Determinate Sentencing Law (DSL) constituted a denial of equal protection. Under the ISL, the maximum term of probation was life. Under the new DSL, the maximum term was five years. The defendant, who had been originally sentenced before the DSL and thereafter was placed on probation for longer than five years, claimed he was entitled to the shorter period under the DSL, and if not, then he was being denied equal protection. In rejecting this claim, the court cited the Kapperman dictum without analysis. (Id. at p. 46, 183 Cal.Rptr. 709.) The court further pointed out that probation was not a form of punishment but an act of clemency, whose purpose is rehabilitation. The court opined, "It is entirely reasonable for the Legislature to decide that those persons who committed an offense prior to [the effective date of the DSL], and were granted probation, be required to fulfill the original or modified terms and conditions of the probation order under which this act of clemency was made, despite the disparity in maximum probationary periods created by the advent of the DSL." (Id. at p. 47, 183 Cal.Rptr. 709.) We further note that the court reviewed the classification scheme under the rational relationship *579 test. (Id. at p. 45, 183 Cal.Rptr. 709.)
The facts, circumstances, and standard of review in Gilchrist distinguish it from this case. Moreover, the court's reliance on Kapperman does not make the dictum more persuasive or suggest that the state's interest in deterring nonviolent drug possession offenses justifies disparate treatment of offenders based on the date of conviction.
In sum, we conclude that classification by date of conviction under Section 8 is not justified by, or necessary to further, a compelling state interest.
We acknowledge that as a rule, courts must strive to preserve the constitutionality of statutes and, where possible, avoid interpretations that raise serious constitutional questions. (See United States v. Delaware & Hudson Co. (1909) 213 U.S. 366, 407-408, 29 S.Ct. 527, 53 L.Ed. 836; People v. Garcia (1999) 21 Cal.4th 1, 25, 87 Cal.Rptr.2d 114, 980 P.2d 829; People v. Birks (1998) 19 Cal.4th 108, 135, 77 Cal.Rptr.2d 848, 960 P.2d 1073; People v. Freeman (1988) 46 Cal.3d 419, 425, 250 Cal.Rptr. 598, 758 P.2d 1128.) Here, however, serious constitutional questions concerning the propriety of Section 8 cannot be avoided. Whether convicted means only the adjudication of guilt or also includes the pronouncement of judgment, that term causes Section 8 to draw a distinction that denies equal protection.
Could there be another reasonable interpretation of convicted that avoids constitutional problems? Indeed, could convicted be construed in defendant's favor to refer to a nonviolent offender, like defendant, who has been found guilty and sentenced but whose judgment did not become final before July 1, 2001? (See People v. Coelho (2001) 89 Cal.App.4th 861, 885, 107 Cal.Rptr.2d 729 [ambiguity in penal statutes construed in favor of defendant when reasonably possible].) We do not think so.
The last qualificationโa judgment that is not final by July 1, 2001โimplies that the judgment may be modified or reversed. Thus, being convicted within the meaning of the Act would represent a tentative, preliminary status and exclude those whose judgments have become final before July 1, 2001. To suggest that defendants whose judgments are no longer subject to reversal on appeal are not convicted does violence to the term. Moreover, the excerpts from the ballot pamphlet do not reasonably suggest that the electorate intended convicted to have a technical meaning that excludes those who clearly come within a common understanding of the term.
In sum, Section 8 is not reasonably susceptible of an interpretation that avoids serious constitutional problems. Given our equal protection analysis, therefore, we hold that the prospective-only provision in Section 8 is unconstitutional insofar as it excludes from the Act those nonviolent offenders convicted before July 1, 2001, and whose judgments are not yet final.

V. Disposition

The judgment is reversed and the matter remanded for resentencing in accordance with the provisions of the Act.[18]
I CONCUR: O'FARRELL, J.[*]
*580 BAMATTRE-MANOUKIAN, J., Dissenting.
I respectfully dissent.
On June 16, 1999, defendant Tommy Lee Fryman pleaded guilty to a charge of possessing cocaine. (Health & Saf.Code, ง 11350.) On October 27, 1999, defendant was sentenced to life in prison with a minimum term of 25 years under the Three Strikes law because defendant admitted nine prior strike felonies, including four robberies, four counts of false imprisonment, and one burglary. (Pen.Code, ง 1170.12, subd. (c)(2).)[1] He contends that, since his conviction is not yet final on appeal, he should be resentenced to probation under Proposition 36 (the Act), enacted by initiative on November 7, 2000. Proposition 36 provides in pertinent part: "Notwithstanding any other provision of law, ... any person convicted of a nonviolent drug possession offense shall receive probation." (ง 1210.1, subd. (a).) Section 8 of the Act states: "Except as otherwise provided, the provisions of this act shall become effective July 1, 2001, and its provisions shall be applied prospectively." The Act took prospective effect approximately 20 months after defendant was sentenced. The majority concludes that defendant has a fundamental liberty interest at stake, that the statutory scheme is subject to strict scrutiny, and that Section 8's prospective-only clause violates equal protection. I respectfully disagree. I conclude that the prospectivity clause has a rational basis and that defendant is not similarly situated with persons not yet sentenced on July 1, 2001, the effective date of the Act.
Section 1210.1 was enacted by initiative as part of Proposition 36, the "Substance Abuse and Crime Prevention Act of 2000" (Prop.36, ง 1). The Act's announced purposes are "(b) To halt the wasteful expenditure of hundreds of millions of dollars each year on the incarcerationโand reincarceration โof nonviolent drug users who would be better served by community-based treatment" and "(c) To enhance public safety by reducing drug-related crime and preserving jails and prison cells for serious and violent offenders, and to improve public health by reducing drug abuse and drug dependence through proven and effective drug treatment strategies." (Prop.36, ง 3.)
The mechanism for accomplishing these purposes is to require probation instead of incarceration for certain people "convicted of a nonviolent drug possession offense" and, as a condition of probation, to require completion of a drug, treatment program. (ง 1210.1, subd. (a).)
The Act discusses its application to two types of cases pending on its effective date, namely (1) when "a defendant on probation at the effective date of this act for a nonviolent drug possession offense" faces revocation of probation for a nonviolent drug possession offense (ง 1210.1, subd. (e)(3)(D)-(F))[2], and (2) when "a parolee *581 already on parole at the effective date of this act" faces parole revocation for a nonviolent drug possession offense (ง 3063.1, subd. (d)(3)(C)-(D))[3]. The Act does not further address its application to other pending cases involving criminal defendants who are not on probation or parole.
The Act is designed to impact sentencing by providing for probation and drug treatment instead of incarceration. It states: "Notwithstanding any other provision of law, ... any person convicted of a nonviolent drug possession offense shall receive probation. As a condition of probation the court shall require participation in and completion of an appropriate drug treatment program." (ง 1210.1, subd. (a).) Based on this language, I conclude that the Act by its terms applies to defendants who have not yet been sentenced on its effective date of July 1, 2001.
The first case to consider this question reached the same conclusion. In re DeLong (2001) 93 Cal.App.4th 562, 113 Cal. Rptr.2d 385, found its answer in section 1210.1, subdivision (a), where it states: "`Notwithstanding any other provision of *582 law, and except as provided in subdivision (b), any person convicted of a nonviolent drug possession offense shall receive probation.' "(Id. at p. 566, 113 Cal.Rptr.2d 385.) In DeLong the People argued that the Act applied either to crimes committed after its effective date or at least to defendants convicted after its effective date. (Id. at p. 565, 113 Cal.Rptr.2d 385.) Looking at subdivision (a) of section 1210.1, the court concluded, "Thus, by the plain meaning of the statute, it is the date of conviction, not the date of commission of the offense, which determines eligibility." (Id. at p. 567, 113 Cal.Rptr.2d 385.) The court construed "convicted" to mean convicted and sentenced. (Id. at pp. 568-570, 113 Cal.Rptr.2d 385.) Other appellate courts have agreed with this reasoning. In re Scoggins (2001) 94 Cal.App.4th 650, 114 Cal.Rptr.2d 508 cited DeLong in concluding "`conviction' within the meaning of section 1210.1 means adjudication of guilt and sentencing." (Id. at p. 657, 114 Cal. Rptr.2d 508.) People v. Floyd (2002) 95 Cal.App.4th 1092, 116 Cal.Rptr.2d 256 (petn. for review pending, petn. filed Mar. 19, 2002) stated, "DeLong correctly interpreted the word `conviction' as requiring both adjudication of guilt and imposition of sentence." (Id. at p. 1097, 116 Cal. Rptr.2d 256, italics in original.) People v. Legault (2002) 95 Cal.App.4th 178, 115 Cal. Rptr.2d 352 stated, "even under DeLong, defendant is not entitled to the benefits of Proposition 36," since he pleaded guilty and was sentenced before its effective date. (Id. at p. 181, 115 Cal.Rptr.2d 352.) Under the reasoning of these cases, the Act by its terms does not apply to defendants, such as Fryman, who were convicted and sentenced well before its effective date.
Defendant asserts that he is entitled to the benefit of the rule of amelioration or mitigation. Ordinarily legislation that reduces a criminal penalty is applied retroactively to cases where the judgment is not final on the theory that the Legislature has determined that the new penalty is sufficient and the old one was too harsh. (In re Estrada (1965) 63 Cal.2d 740, 745, 48 Cal.Rptr. 172, 408 P.2d 948.) However, this rule does not apply where the Legislature expressly or implicitly intended to make the amendment operate prospectively. (People v. Nasalga (1996) 12 Cal.4th 784, 793, 50 Cal.Rptr.2d 88, 910 P.2d 1380.) I agree with the majority that the prospectivity clause makes the rule of amelioration inapplicable to the Act. (People v. DeLong, supra, 93 Cal.App.4th 562, 567, 113 Cal.Rptr.2d 385; People v. Legault, supra, 95 Cal.App.4th 178, 181, 115 Cal. Rptr.2d 352; People v. Floyd, supra, 95 Cal.App.4th 1092, 1100, 116 Cal.Rptr.2d 256.)
Since the Act by its terms does not apply to defendant and it was not intended to operative retroactively, the remaining question is whether equal protection requires a retroactive application of the Act.
An equal protection challenge involves identifying the applicable standard of review. Darces v. Woods (1984) 35 Cal.3d 871, 201 Cal.Rptr. 807, 679 P.2d 458 summarized the different standards of equal protection review. "The guarantees of equal protection embodied in the Fourteenth Amendment of the United States Constitution and article I, section 7 of the California Constitution `compel[ ] recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment.' [Citations.] `This principle, of course, does not preclude the state from drawing any distinctions between different groups of individuals, but does require that, at a minimum, classifications which are created bear a rational relationship to a legitimate public purpose.' [Citation.] However, this deferential standard *583 is inapplicable `"in cases involving `suspect classifications' or touching on `fundamental interests'...."' [Citation.] In such cases `the state bears the burden of establishing not only that it has a compelling interest which justifies the law but that distinctions drawn by the law are necessary to further its purpose.'" (Id. at p. 885, 201 Cal.Rptr. 807, 679 P.2d 458; cf. Adams v. Commission on Judicial Performance (1994) 8 Cal.4th 630, 659, 34 Cal.Rptr.2d 641, 882 P.2d 358.)
The majority here concludes, "Like the schemes in [People v.] Olivas [(1976) 17 Cal.3d 236], [131 Cal.Rptr. 55, 551 P.2d 375] and [People v.] Nguyen [(1997) 54 Cal.App.4th 705], 63 Cal.Rptr.2d 173, the classification-by-date-of-conviction scheme here affects defendants' fundamental interest in liberty.... [I]n this case, the impact of the scheme is dramatic: Defendant faces incarceration for 25 years to life, whereas under the Act he would be free on probation for drug treatment. Under the circumstances, therefore, we conclude that the distinction drawn by Section 8 is subject to strict scrutiny." (Maj. opn., ante, at p. 573.)
I do not believe Olivas compels this conclusion. Prior to Olivas, the California Supreme Court applied the rational basis standard in In re Kapperman (1974) 11 Cal.3d 542, 114 Cal.Rptr. 97, 522 P.2d 657 to a new statute prospectively awarding presentence custody credit. (Id. at p. 545, 114 Cal.Rptr. 97, 522 P.2d 657.) The court stated that the equal protection clauses of the federal and state constitution "prohibit the state from arbitrarily discriminating among persons subject to its jurisdiction, and require that classifications between those to whom the state accords and withholds substantial benefits must be reasonably related to a legitimate public purpose." (Ibid.) The court did not consider whether a fundamental right was at stake.
Olivas ultimately concluded that it violated equal protection to confine a person under the age of 21 to a longer term in the Youth Authority than he or she would be confined in jail for committing the same misdemeanor offense if over 21. In reaching this conclusion, the court stated: "No reason has been suggested, nor can we conceive of any, why the concern for personal liberty implicit in both the California and federal Constitutions is any less compelling in defendant's case. We believe that those charters are no less vigilant in protecting against continuing deprivations of liberty than are their due process clauses in protecting against the initial deprivation of that liberty. We conclude that personal liberty is a fundamental interest, second only to life itself, as an interest protected under both the California and United States Constitutions." (People v. Olivas, supra, 17 Cal.3d 236, 250-251, 131 Cal.Rptr. 55, 551 P.2d 375.) After reaching that conclusion, the court proceeded to apply a strict scrutiny standard to the differential sentencing scheme. (Id. at pp. 251-257, 131 Cal.Rptr. 55, 551 P.2d 375.)
Some California courts have followed Olivas in applying strict scrutiny to penal code classifications. (E.g., People v. Murray (1994) 23 Cal.App.4th 1783, 1792, 29 Cal.Rptr.2d 42 [the double the base term limit should apply to sentences for both felonies and misdemeanors]; In re Jiminez (1985) 166 Cal.App.3d 686, 691, 692, 212 Cal.Rptr. 550 [conduct credits should be available to misdemeanants while in the California Rehabilitation Center]; People v. Poole (1985) 168 Cal.App.3d 516, 525, 214 Cal.Rptr. 502 [work-time credits unavailable before sentencing]; People v. Caruso (1984) 161 Cal.App.3d 13, 17, 207 Cal.Rptr. 221 [work-time credits unavailable before sentencing].) As I observed in my concurring opinion in People v. Nguyen, supra, 54 Cal.App.4th 705, 720, 63 *584 Cal.Rptr.2d 173, other California courts have concluded that Olivas was not intended to apply so broadly as to subject every penal code classification to strict scrutiny. (People v. Davis (1979) 92 Cal.App.3d 250, 258, 154 Cal.Rptr. 817 [there is a rational basis to classify cocaine as a narcotic rather than a stimulant]; People v. Mitchell (1994) 30 Cal.App.4th 783, 795-796, 36 Cal. Rptr.2d 150 [there is a rational basis to criminalize possessing over $100,000 to purchase drugs]; People v. Bell (1996) 45 Cal.App.4th 1030, 1048-1049, 53 Cal. Rptr.2d 156 [there is a rational basis to criminalize repeated rent skimming].)
My concurring opinion in People v. Nguyen, supra, 54 Cal.App.4th 705, 63 Cal. Rptr.2d 173 observed: "I am not convinced, however, that People v. Olivas [, supra,] 17 Cal.3d 236, 131 Cal.Rptr. 55, 551 P.2d 375 requires application of the strict scrutiny standard here solely on the basis that a criminal defendant is facing incarceration. (People v. Silva (1994) 27 Cal.App.4th 1160, 1167, 33 Cal.Rptr.2d 181.) I understand Olivas to establish only that persons convicted of the same crime and otherwise similarly situated should not be punished differently absent a compelling state interest. Equal protection does not require equal treatment of convicts with different criminal histories. (People v. Spears (1995) 40 Cal.App.4th 1683, 1687-1688, 48 Cal.Rptr.2d 634; People v. Cooper (1996) 43 Cal.App.4th 815, 828-830, 51 Cal.Rptr.2d 106.) Strict scrutiny is not implicated simply because the Legislature has provided for the potential incarceration of future lawbreakers by defining a crime and distinguishing degrees of culpability. (People v. Mitchell [, supra,] 30 Cal.App.4th 783, 795-796, 36 Cal. Rptr.2d 150; People v. Bell [, supra,] 45 Cal.App.4th 1030, 1049, 53 Cal.Rptr.2d 156; People v. Davis [, supra,] 92 Cal.App.3d 250, 258, 154 Cal.Rptr. 817.) In view of these recent cases which question how broadly Olivas applies, I would respectfully invite the California Supreme Court to provide guidance on this issue." (Id. at p. 720,131 Cal.Rptr. 55, 551 P.2d 375.)
In concluding that "personal liberty is a fundamental interest," Olivas did not consider the degree to which a valid criminal conviction substantially diminishes an individual's interest in liberty. Greenholtz v. Nebraska Penal Inmates (1979) 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 made the following observation in a due process analysis. "There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence. The natural desire of an individual to be released is indistinguishable from the initial resistance to being confined. But the conviction, with all its procedural safeguards, has extinguished that liberty right: `[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his [or her] liberty.' (Meachum v. Fano (1976) 427 U.S. 215, 224, 96 S.Ct. 2532, 49 L.Ed.2d 451.)" (Id. at p. 7, 99 S.Ct. 2100.) Chapman v. United States (1991) 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 rejected a claim that arbitrary federal drug sentences violated a fundamental liberty interest as follows. "Every person has a fundamental right to liberty in the sense that the Government may not punish him [or her] unless and until it proves his [or her] guilt beyond a reasonable doubt at a criminal trial conducted in accordance with the relevant constitutional guarantees. [Citation.] But a person who has been so convicted is eligible for, and the court may impose, whatever punishment is authorized by statute for his [or her] offense, so long as that penalty is not cruel and unusual, [citations] and so long as the penalty is not based on an arbitrary distinction that would violate the Due Process Clause of the Fifth Amendment. In this *585 context, as we noted in Jones v. United States, 463 U.S. 354, 362, n. 10, 103 S.Ct. 3043, 77 L.Ed.2d 694, (1983), an argument based on equal protection essentially duplicates an argument based on due process." (Id. at p. 465,103 S.Ct. 3043.)
In discussing whether a defendant has a federal constitutional right to a jury trial on a sentence enhancing allegation, the California Supreme Court has observed that "a defendant's liberty interest `has been substantially diminished by a guilty verdict.'" (People v. Wims (1995) 10 Cal.4th 293, 307, 41 Cal.Rptr.2d 241, 895 P.2d 77 [overruled on another ground by People v. Sengpadychith (2001) 26 Cal.4th 316, 325-326], 109 Cal.Rptr.2d 851, 27 P.3d 739.)
Cases have applied this or similar reasoning to equal protection challenges. "We believe that there is a qualitative difference, however, between the initial interest one has in retaining his [or her] liberty prior to sentencing and the interest one has in whether or not an enhancement applies." (People v. Hernandez (1979) 100 Cal.App.3d 637, 644, fn. 2, 160 Cal.Rptr. 607.) Hernandez concluded that the rational basis test applied to a legislative distinction between prior in-state and out-of-state convictions as sentence enhancements. (Id. at p. 644, 160 Cal.Rptr. 607.) The Fifth District, which authored Hernandez, later disapproved of this reasoning in People v. Williams (1983) 140 Cal.App.3d 445, 189 Cal.Rptr. 497 "in light of recent developments of equal protection analysis concerning prisoners' rights to parole release dates and in-prison conduct credits." (Id. at p. 450, 189 Cal.Rptr. 497.) However, People v. Flores (1986) 178 Cal.App.3d 74, 88, 223 Cal.Rptr. 465, and People v. Alvarez (2001) 88 Cal.App.4th 1110, 1116, 106 Cal.Rptr.2d 447, have relied on Hernandez. People v. Flores, supra, 178 Cal. App.3d 74, 223 Cal.Rptr. 465 stated: "Appellant does not have a fundamental interest in a specific term of imprisonment. ..." (Id. at p. 88, 223 Cal.Rptr. 465.) Flores concluded that the rational basis test applied to the failure to distinguish the sentences for first and second degree attempted murder. (Ibid.)
In the case before us, at the time defendant committed his crime, when he pleaded guilty, and when he was sentenced, he had no fundamental or statutory right to probation or to drug treatment programs that were not yet in existence. His liberty interest was "substantially diminished" by his conviction. (People v. Wims, supra, 10 Cal.4th 293, 307, 41 Cal.Rptr.2d 241, 895 P.2d 77.) He had no right to be sentenced under a statute that took effect prospectively almost 20 months after he was sentenced. In terms of defendant's sentence, equal protection only guaranteed that he would receive no more than the same sentence possible for others with a similar criminal history, that is, two or more strike felonies, who committed a similar crime. Defendant does not suggest that his punishment was disparate under the applicable Three Strikes law. I respectfully disagree with the majority's application of the strict scrutiny standard. I conclude that the rational basis standard is applicable to the change in sentencing schemes for nonviolent drug offenders which became effective on July 1, 2001.
I further conclude that there is a rational basis for distinguishing between nonviolent drug offenders based on whether they were sentenced before or after the Act's effective date of July 1, 2001. In other words, these classes of offenders are not similarly situated. "Some decisions speak of an initial constitutional inquiry to determine whether the groups affected are similarly situated with respect to the purpose of the legislation or other state action. (See, e.g., In re Eric J. (1979) 25 Cal.3d *586 522, 531, 159 Cal.Rptr. 317, 601 P.2d 549.) To ask whether two groups are similarly situated in this context, however, is the same as asking whether the distinction between them can be justified under the appropriate test of equal protection. Obvious dissimilarities between groups will not justify a classification which fails strict scrutiny (if that test is applicable) or lacks a rational relationship to the legislative purpose." (Fullerton Joint Union High School Dist. v. State Bd. of Education (1982) 32 Cal.3d 779, 798, fn. 19, 187 Cal. Rptr. 398, 654 P.2d 168.)
Whenever a new statute confers a previously nonexistent benefit, an effective start date must be established. This situation arises every time the Legislature reduces punishment under a penal statute. Any cutoff date for applying the new statute is necessarily arbitrary. As pointed out by People v. Superior Court (Gonzales) (1978) 78 Cal.App.3d 134, 144 Cal.Rptr. 89, "We would further note that all legally defined time periodsโsuch as, the time for commencing an action, for service and return of summons, for bringing a case to trial, for setting aside a judgment, or for taking an appealโas well as effective dates of statutes, are arbitrary in the sense that other periods or dates might have been chosen. This is unavoidable." (Id. at p. 142, 144 Cal.Rptr. 89.)
A number of cases illustrate that the equal protection clause does not dictate that beneficial statutes must have retroactive effect. "`A refusal to apply a statute retroactively does not violate the Fourteenth Amendment.' (People v. Aranda (1965) 63 Cal.2d 518, 532, 47 Cal.Rptr. 353, 407 P.2d 265.) `[T]he Fourteenth Amendment does not forbid statutes and statutory changes to have a beginning and thus to discriminate between the rights of an earlier and later time.' (Sperry & Hutchinson Co. v. Rhodes (1911) 220 U.S. 502, 505, 31 S.Ct. 490, 55 L.Ed. 561.)" (Baker v. Superior Court (1984) 35 Cal.3d 663, 668-669, 200 Cal.Rptr. 293, 677 P.2d 219.) The issue in Baker was the prospective repeal of laws pertaining to mentally disordered sex offenders (MDSO). The statute was written to exclude people committed as MDSOs prior to its effective date. (Id. at p. 666-667, 200 Cal.Rptr. 293, 677 P.2d 219.) The result was that those already civilly committed were subject to indefinite confinement and treatment, while new offenders were subject to definite and limited punishment. (Id. at p. 668, 200 Cal. Rptr. 293, 677 P.2d 219.) The court essentially concluded that there is a differential result whenever the Legislature creates or abolishes a treatment program, and that equal protection allows discrimination based on the date of commitment. (Id. at p. 669, 200 Cal.Rptr. 293, 677 P.2d 219.)
Other California cases have also recognized that the necessity to fix a start date for new statutory benefits does not make a date-based classification irrational. Talley v. Municipal Court (1978) 87 Cal.App.3d 109, 150 Cal.Rptr. 743 concerned implementation of alcohol treatment programs for drunk drivers as an alternative to a mandatory license suspension. Qualification for treatment depended on the offense being committed after the statute's effective date. (Id. at p. 112, 150 Cal.Rptr. 743.) The court did not apply strict scrutiny because a driver's license suspension is not a fundamental interest. (Id. at p. 114, 150 Cal.Rptr. 743.) The court concluded it was rational to assign a cut-off date "to avoid the risk of a flood of applicants, which would create chaos in the new programs and render them ineffective." (Id. at p. 115, 150 Cal.Rptr. 743.) "Every effort aimed at meliorating the many ways in which we make life hard for ourselves and others has to start at some point. The Constitution does not compel that such programs immediatelyโor at any time *587 ...โbe open to all who want to get into them." (Id. at p. 116, 150 Cal.Rptr. 743.)
People v. Gilchrist (1982) 133 Cal. App.3d 38, 183 Cal.Rptr. 709 rejected retroactive application of the maximum probation period provided by the Determinate Sentence Law to persons already on probation prior to its effective date. The defendant contended it was arbitrary to discriminate among probationers based on the dates of their offenses. The court stated: "It is perfectly proper for the Legislature to create a new sentencing procedure which operates prospectively only. Despite the disparity created by rendering different sentences after an admittedly arbitrarily chosen date, prospective application of such a statute does not violate equal protection principles, because of the legitimate public purpose of assuring `that penal laws will maintain their desired deterrent effect by carrying out the original prescribed punishment as written.' (In re Kapperman, supra, 11 Cal.3d at p. 546, 114 Cal.Rptr. 97, 522 P.2d 657.)" (Id. at p. 45, 183 Cal.Rptr. 709.) The court did not apply strict scrutiny. (Ibid.)
"States are certainly free to amend their sentencing laws and, having done so, they are not required to apply them retroactively to persons who have been validly sentenced under the law as it previously existed." (Murray v. Cowley (10th Cir.1990) 913 F.2d 832, 834; cf. Luck v. D.C. Parole Board (D.C.Cir.1993) 996 F.2d 372, 374-375; Jones v. Cupp (9th Cir.1971) 452 F.2d 1091, 1093; In re Stinnette (1979) 94 Cal. App.3d 800, 806, 155 Cal.Rptr. 912.) "There is no denial of equal protection in having persons sentenced under one system for crimes committed before July 1, 1984 and another class of prisoners sentenced under a different system." (Foster v. Wash. St. Bd. etc. (9th Cir.1989) 878 F.2d 1233, 1235.)
The majority essentially concludes that persons convicted of nonviolent drug possession offenses before and after the effective date of the Act are similarly situated with respect to the purpose of the Act. "Specifically, the members of both classes committed the same type of offense. Moreover, diverting to drug treatment a nonviolent offender found guilty before July 1, 2001, and whose judgment is not final, would save as much money and enhance public safety and health just as much as diverting an offender convicted after that date." (Maj. opn, ante, at p. 570.)
I believe the Act has another purpose in addition to saving money and enhancing public safety and health, a purpose evident in its prospectivity clause. By setting a future start date, the voters allowed time to establish and fund drug treatment programs. (In re DeLong, supra, 93 Cal. App.4th 562, 566, 113 Cal.Rptr.2d 385.) The concern for avoiding administrative chaos from an immediate start is apparent. The affected programs and government agencies were given a lead time and a future start date "to avoid the risk of a flood of applicants, which would create chaos in the new programs and render them ineffective." (Talley v. Municipal Court, supra, 87 Cal.App.3d 109, 115, 150 Cal.Rptr. 743.) A majority in People v. Floyd, supra, concluded, "Prospective application of the initiative helps ensure that the transition will be orderly and effective and reduces the risk that existing drug treatment programs will be overloaded. This is quite reasonable and rational." (People v. Floyd, supra, 95 Cal.App.4th 1092, 1102, 116 Cal.Rptr.2d 256 (petn. for review pending, petn. filed Mar. 19, 2002).) This purpose is also served by finding the Act applicable only to those not yet sentenced when it took effect on July 1, 2001. If the sole purposes of the Act were simply to "save as much money" as possible and *588 to "enhance public safety" and health, the Act would have been given immediate effect.
Because every new beneficial statute must have a start date, it is clear that the dates of the offense, the conviction, or the sentencing will qualify some for the statute's benefits and disqualify others. Because such a distinction is unavoidable, it is rational to specify a start date. Defendants who were sentenced under the laws in effect before July 1, 2001 are not similarly situated to those who are sentenced after the effective date of Proposition 36. (Murray v. Cowley, supra, 913 F.2d 832, 834.) They may be sentenced for the same offense, but under different sentencing schemes with different objectives. Punishment was the objective before July 1, 2001. Treatment, public safety and health, and cost savings are the objectives after July 1, 2001. The purpose of Proposition 36, by its own terms, is to divert certain nonviolent drug offenders from incarceration who were not yet sentenced on July 1, 2001. I conclude that the prospectivity clause in section 8 has a rational basis and that defendant Fryman, having been convicted on June 16, 1999, and sentenced on October 27, 1999, is not similarly situated to those sentenced on or after July 1, 2001, the effective date of the Act.
NOTES
[1] All further statutory references are to the Penal Code unless otherwise specified.
[2] After the Act was passed, the Legislature amended some of the new code sections and added others. (Slats.2001, ch. 721, งง 1-10, No. 11 West's Cal. Legis. Service, pp. 4444-4452.) Among other things, the Legislature added Division 10.9 (commencing with Section 11999.20) to the Health and Safety Code, which provides an accountability program for substance abuse testing and treatment. (Slats.2001, ch. 721, ง 1.) It also added sections 1210.5 and 3063.2 to the Penal Code, which require drug testing as a treatment tool for probationers and parolees. (Stats.2001, ch. 721, งง 4 & 6.)

Our overview of the Act incorporates the legislative amendments.
[3] There are also exclusions for those convicted in the same proceeding of both a nonviolent drug possession offense and a felony or misdemeanor not related to the use of drugs (ง 1201.1, subd. (b)(2)); those who possessed or were under the influence of a specified drug while using a firearm (ง 1210.1, subd. (b)(3)(A) & (B)); and those who refuse drug treatment as a condition of probation (ง 1210.1, subd. (b)(4)); those who have twice failed drug treatment as a condition of probation and been found not to be amenable to drug treatment (ง 1210.1, subd. (b)(5)).

For convenience, we refer to those persons convicted of a nonviolent drug possession offense who are not excluded from probation under section 1210.1, subdivision (b), as nonviolent drug offenders.
[4] As noted, the initiative was passed in November 7, 2000. An initiative takes effect the day after the election in which it is passed unless the initiative provides otherwise. (Cal. Const., art. II, ง 10, subd. (a).)
[5] Defendant's concurrent convictions for possession and being under the influence did not bring him within the exclusion established in section 1210.1, subdivision (b)(2). (See fn. 3, ante.)
[6] Defendant's prior strike convictions raise another issue. Under the Three Strikes law, these convictions would ordinarily render him ineligible for probation. (งง 667, subd. (c)(2); 1170.12, subd. (a)(2).) Moreover, the Three Strikes law applies "[notwithstanding any other law ...." (งง 667, subd. (c), and 1170.12, subd. (a).) As noted, however, the Act mandates probation for some nonviolent drug offenders who have prior strike convictions, and it too "[n]otwithstanding any other provisions of law ...."(ง 1210.1, subd. (a).) Thus, there is a conflict between the two provisions as they apply to certain nonviolent drug offenders with prior strike convictions. We resolve this conflict in favor of the Act.

Clearly, the "notwithstanding" language in the Three Strikes law could not have been intended to override the provisions of the Act, which did not exist when the Three Strikes law was enacted. On the other hand, the "notwithstanding" language of the Act was passed in light of existing law, which included the Three Strikes law. (See People v. Ervin (1996) 50 Cal.App.4th 259, 264, 57 Cal. Rptr.2d 728, disapproved on other grounds in People v. Fuhrman (1997) 16 Cal.4th 930, 947, fn. 11, 67 Cal.Rptr.2d 1, 941 P.2d 1189; see People v. Hernandez (1988) 46 Cal.3d 194, 201, 249 Cal.Rptr. 850, 757 P.2d 1013 ["the Legislature is deemed to be aware of statutes and judicial decisions already in effect and to have enacted the new statute in light thereof"] disapproved on another ground in People v. King (1993) 5 Cal.4th 59, 78, fn. 5, 19 Cal. Rptr.2d 233, 851 P.2d 27.) Under the circumstances, and given the reasons for and purposes of the Act, we conclude that the electorate intended for the Act to apply despite the prohibition against probation in the Three Strikes law. Indeed, a contrary view would render parts of the Act meaningless and ineffective, a result courts must try to avoid in construing statutes. (See People v. Thomas (1992) 4 Cal.4th 206, 210, 14 Cal.Rptr.2d 174, 841 P.2d 159.)
[7] On remand, the People would not be limited to the record before us and could present admissible evidence to establish that defendant is ineligible under the Act.
[8] "... [F]or the purpose of determining retroactive application of an amendment to a criminal statute, a judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed. [Citations.]" (People v. Nasalga (1996) 12 Cal.4th 784, 789, fn. 5, 50 Cal.Rptr.2d 88, 910 P.2d 1380.)
[9] Without a reference point the prospectivity clause would have no purpose or meaning. It would simply express what is implicit and obvious: The Act may not be applied before it becomes effective. However, whenever possible, we must "give effect to every word in a statute and avoid a construction making a statutory term surplusage or meaningless. [Citations.]" (In re Jerry R. (1994) 29 Cal. App.4th 1432, 1437, 35 Cal.Rptr.2d 155; People v. Craft (1986) 41 Cal.3d 554, 560, 224 Cal.Rptr. 626, 715 P.2d 585; People v. Western Air Lines, Inc. (1954) 42 Cal.2d 621, 638, 268 P.2d 723.)
[10] As noted, probationers and parolees are dealt with separately in sections 1210.1, subdivision (e), and 3063.1. With respect to those on probation or parole before and after July 1, 2001, these provisions of the Act make the commission of a nonviolent drug possession offense or similar conduct in violation of the terms of probation or parole the point of reference for determining the applicability of the Act.
[11] We grant defendant's request for judicial notice of the ballot pamphlet arguments and the text of the initiative. (Evid.Code, งง 452, subd. (c), 459; People v. Hazelton (1996) 14 Cal.4th 101, 107, fn. 2, 58 Cal.Rptr.2d 443, 926 P.2d 423.)
[12] In a footnote, the court noted that after it issued the order to show cause, the Los Angeles County District Attorney's office adopted an interim policy, under which it would consider those found guilty but not sentenced before July 1, 2001, were eligible for probation under the Act. (Delong, supra, 93 Cal. App.4th at p. 565, fn. 2, 113 Cal.Rptr.2d 385.)
[13] Recently, in People v. Floyd, supra, 95 Cal. App.4th 1092, 116 Cal.Rptr.2d 256, the majority rejected an equal protection claim like that raised here. The majority reasoned that because the defendant was convicted before July 1, 2001, he was not similarly situated to those convicted after that date. As noted, however, it is the distinction by date of conviction that is itself being challenged. Consequently, the mere fact the date distinguishes the two groups of defendants does not establish that the two groups are not similarly situated.
[14] The dissent declines to follow Olivas and criticizes it for failing to consider "the degree to which a valid criminal conviction substantially diminishes an individual's interest in liberty." (Dis. opn. of Bamattre Manoukian, J., post at p. 584.) However, the dissent offers no facts or circumstances that so distinguish the classification scheme here from that in Olivas with respect to a defendant's fundamental interest in liberty as to render Olivas inapposite and nonbinding.

We note that the dissent implicitly concedes that Olivas and strict scrutiny apply where a statutory classification punishes differently persons convicted of the same crime and otherwise similarly situated. (Dis. opn. of Bamattre Manoukian, J., post at p. 584 ["`I understand Olivas to establish only that persons convicted of the same crime and otherwise similarly situated should not be punished differently absent a compelling state interest'"].) The dissent finds nonviolent drug offenders convicted of the same crime before and after July 1, 2001, not to be similarly situated because there is a rational purpose for distinguishing between them. (Dis. opn. of Bamattre-Manoukian, J., post at pp. 585-588.) However, the purported existence of a rational purpose does not explain why the classification scheme here does not affect defendant's fundamental interest in liberty or otherwise demonstrate why the scheme is not subject to strict scrutiny. Indeed, in Olivas, the People suggested that incarcerating juveniles longer than adults for the same crime is rational because it promotes the rehabilitative purpose of the juvenile law. (Olivas, supra, 17 Cal.3d at pp. 251-256, 131 Cal.Rptr. 55, 551 P.2d 375.) However, even assuming a rational basis to distinguish between minors and adults, the court found strict scrutiny the appropriate standard of review given the fundamental interest involved.
[15] The dissent also asserts this position. (Dis. opn. of Bamattre-Manoukian., post, at pp. 587-588.)
[16] Government Code section 9608 provides, "The termination or suspension (by whatsoever means effected) of any law creating a criminal offense does not constitute a bar to the indictment or information and punishment of an act already committed in violation of the law so terminated or suspended, unless the intention to bar such indictment or information and punishment is expressly declared by an applicable provision of law."
[17] We point out that in Estrada, supra, 63 Cal.2d at pp. 742, 746-748, 48 Cal.Rptr. 172, 408 P.2d 948, the court disapproved Harmon and the cases cited therein concerning the effect of the general savings clause when the Legislature amends the law to lessen punishment.
[18] Given our disposition, we need not address defendant's claims that the court erred in refusing to dismiss prior convictions and that his life sentence constitutes cruel and unusual punishment.
[*] Judge of the Monterey Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.
[1] Unspecified section references are to the Penal Code.
[2] Section 1210.1, subdivision (e)(3) states in part: "(D) If a defendant on probation at the effective date of this act for a nonviolent drug possession offense violates that probation either by being arrested for a nonviolent drug possession offense, or a misdemeanor for simple possession or use of drugs or drug paraphernalia, being present where drugs are used, or failure to register as a drug offender, or any activity similar to those listed in paragraph (1) of subdivision (d) of Section 1210, or by violating a drug-related condition of probation, and the state moves to revoke probation, the court shall conduct a hearing to determine whether probation shall be revoked. The trial court shall revoke probation if the alleged probation violation is proved and the state proves by a preponderance of the evidence that the defendant poses a danger to the safety of others. If the court does not revoke probation, it may modify probation and impose as an additional condition participation in a drug treatment program. "(E) If a defendant on probation at the effective date of this act for a nonviolent drug possession offense violates that probation a second time either by being arrested for a nonviolent drug possession offense, or a misdemeanor for simple possession or use of drugs or drug paraphernalia, being present where drugs are used, or failure to register as a drug offender, or any activity similar to those listed in paragraph (1) of subdivision (d) of Section 1210, or by violating a drug-related condition of probation, and the state moves for a second time to revoke probation, the court shall conduct a hearing to determine whether probation shall be revoked. The trial court shall revoke probation if the alleged probation violation is proved and the state proves by a preponderance of the evidence either that the defendant poses a danger to the safety of others or that the defendant is unamenable to drug treatment. If the court does not revoke probation, it may modify probation and impose as an additional condition participation in a drug treatment program. "(F) If a defendant on probation at the effective date of this act for a nonviolent drug offense violates that probation a third time either by being arrested for a nonviolent drug possession offense, or by violating a drugrelated condition of probation, and the state moves for a third time to revoke probation, the court shall conduct a hearing to determine whether probation shall be revoked. If the alleged probation violation is proved, the defendant is not eligible for continued probation under subdivision (a)."
[3] Section 3063.1, subdivision (d)(3), states in part: "(C) If a parolee already on parole at the effective date of this act violates that parole either by committing a nonviolent drug possession offense, or a misdemeanor for simple possession or use of drugs or drug paraphernalia, being present where drugs are used, or failure to register as a drug offender, or any activity similar to those listed in paragraph (1) of subdivision (d) of Section 1210, or by violating a drugrelated condition of parole, and the Parole Authority acts to revoke parole, a hearing shall be conducted to determine whether parole shall be revoked. Parole shall be revoked if the parole violation is proved and a preponderance of the evidence establishes that the parolee poses a danger to the safety of others. If parole is not revoked, the conditions of parole may be modified to include participation in a drug treatment program as provided in subdivision (a). This paragraph does not apply to any parolee who at the effective date of this act has been convicted of one or more serious or violent felonies in violation of subdivision (c) of Section 667.5 or Section 1192.7.

"(D) If a parolee already on parole at the effective date of this act violates that parole for the second time either by committing a nonviolent drug possession offense, or by violating a drug-related condition of parole, and the Parole Authority acts for a second time to revoke parole, a hearing shall be conducted to determine whether parole shall be revoked. If the alleged parole violation is proved, the parolee is not eligible for continued parole under any provision of this section and may be reincarcerated."